1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDREW MOUA,<br><br>        Plaintiff,<br><br>        v.<br><br>L. MCABEE; CITY OF MERCED;<br>UNKNOWN MERCED POLICE OFFICERS<br>DOES 1-20; DOES 21-30,<br><br>        Defendants. | 1:06-cv-00216 OWW SMS<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CITY OF MERCED'S  MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, SUMMARY ADJUDICATION** |

## I. INTRODUCTION.

This case arises out of the February 24, 2005 arrest of Plaintiff Andrew Moua ("Andrew") and seizure of his personal property, a "Pantera Claw," an object that appears similar to metal brass knuckles, by Merced police officers at the home he shared with his parents, girlfriend, and brother, Chou Moua, in Merced, California.  Chou was on probation at the time, the terms of which included consent to warrantless residence searches, and Merced police officers conducted a probation search of the Moua house as part of Operation Safe Street II.  This operation involved a number of searches of probationers' homes in response

1

1  to a recent double homicide.

2      Plaintiff Moua brings this action under 42 U.S.C. § 1983 and

3  42 U.S.C. § 1988, alleging Merced police officers violated his

4  Fourth, First and Fourteenth Amendment rights.  In addition,

5  Plaintiff alleges that the City of Merced and individual Merced

6  police officers should be held liable on various state law

7  theories.

8      Before the court for decision is Defendant City of Merced's

9  motion for summary judgment, or in the alternative, summary

10  adjudication as to Plaintiff's entire complaint.  Defendant seeks

11  judgment on the grounds that Plaintiff cannot 1) establish his

12  federal constitutional claims, 2) overcome the qualified immunity

13  of the individual defendants, or 3) establish Monell liability of

14  the City of Merced.  Defendant also argues the state law claims

15  should be dismissed because the officers 4) acted lawfully, 5)

16  are entitled to immunity under California Government Code §§

17  821.6 and 815.2(b), and 6) Plaintiff lacks evidence to support

18  some of his claims.

19

20              II. <u>FACTUAL AND PROCEDURAL BACKGROUND</u>.

21      A.    <u>Events Leading Up to the Arrest and "Pantera Claw"</u>

22            <u>Seizure</u>

23      1.    <u>Undisputed Facts</u>

24      On February 24, 2005, the Merced Police Department and a

25  number of state, local and federal agencies conducted Operation

26  Safe Street II, consisting of probation searches across eastern

27  Merced County.  (Defendant's Statement of Undisputed Material

28  Facts ("DSUMF") ## 1, 4.)  The operation was undertaken in

                              2

response to two gang-related murders that had taken place in Merced a few weeks earlier and was designed to generate information and evidence as part of the investigation of the murders.  (DSUMF ## 2-3.)  The residences targeted in Operation Safe Streets II were selected based on a number of criteria, including known gang affiliation, without respect to any gang's ethnic association.  (DSUMF #5.)  A temporary command post was established at Merced County Fairgrounds for coordinating the operation and processing arrested individuals.  (DSUMF #6.)

One of the residences included in Operation Safe Street II was the home of Chou Moua, the Plaintiff's brother.  (DSUMF #7.) Chou was on probation following an August 18, 2003 conviction for the felony of carrying a concealed loaded weapon in violation of California Penal Code § 12025(b)(6).  (DSUMF #8.)  One condition of Chou's probation was that he submit his "person, vehicle, place of residence or any other belongings to search and seizure, without a warrant, any time day or night, by any Probation Officer and/or Peace Officer, with or without probable cause." (DSUMF #9.)

The team that searched the Moua home midday on February 24, 2005 included probation officer Moses Nelson, police officers Cruz Jasso, Jobe Sandhagen, and Larry McAbee, and two or three state/federal agents.  (DSUMF ## 11-14.)  The front door to the Moua home was open when officers arrived and Chong Moua, Plaintiff's father, was outside.  (DSUMF ## 15-16.)  The officers spoke to Mr. Moua about Chou and, after entering the house, found Chou on the couch in the living room located at the front of the house.  (DSUMF ## 16, 18.)  No force was used to enter the house.

3

1   (DSUMF #17.)

2         **2.   Disputed Facts**.

3         Defendant claims Chou Moua was suspected of being associated

4   with a criminal gang in the area.  (DSUMF #10.)  Plaintiff does

5   not dispute that Officer Jasso testified to this but objects to

6   the characterization of Chou as vague.  Defendant asserts that

7   Officer Nelson led the search team at the Moua residence.  (DSUMF

8   #11.)  Plaintiff contends that Officer Jasso was "in charge of

9   the search" and led the team.

10        When the officers arrived at the Moua house, Defendant

11  contends they asked Chong Moua, Plaintiff's father, about Chou

12  and that Mr. Moua referred them inside the house.  (DSUMF #16.)

13  Plaintiff asserts officers only asked Mr. Moua his son's name

14  upon arrival and Mr. Moua testified "...he was inside so they go

15  get him."

16

17        **B.   The Arrest and Seizure Incident**.

18        **1.   Undisputed Facts**.

19        The officers gathered the occupants of the house into the

20  living room.  (DSUMF #19.)  At the time, Plaintiff, his

21  girlfriend Sara Watson, Chou, and Plaintiff's mother and father

22  were home.  (DSUMF #20.)  When the officers entered the Moua

23  home, Plaintiff and Sara were sleeping in Plaintiff's bedroom.

24  (DSUMF #21.)  The doors to Plaintiff's bedroom were closed and

25  locked routinely for privacy and such was the case on the day of

26

27

28

1   the incident when the officers entered the Moua home.[1]
2   (Plaintiff's Further Material Facts ("PFMF") #66.)  Plaintiff's
3   bedroom is a converted garage with two doors, one leading to the
4   living room and one leading to the backyard.  (Declaration of
5   Andrew Moua ("Moua Decl."), ¶ 1.)  Plaintiff is of Hmong descent
6   while Sara is Caucasian with blonde hair.  (DSUMF ## 22-23.)  One
7   officer knocked on Plaintiff's bedroom door, awakening Sara, who
8   got up to open the door.  (DSUMF #24.)  Sara unlocked the door in
9   response to the officer's knock.  (Moua Decl., ¶ 2.)  Plaintiff
10  asserts officers were standing at his bedroom door when Sara
11  opened it and heard the door being unlocked.  (*Id.*)  The officer
12  told Sara that all the occupants of the house were requested to
13  go to the living room.  (DSUMF #25.)  Sara woke Plaintiff up and
14  both of them went to the living room.  (DSUMF #26.)  Neither
15  closed the bedroom door behind them as they left the room.
16  (DSUMF #30.)  No officer otherwise spoke to Plaintiff or Sara at
17  that time.  (DSUMF #27.)  Officer Sandhagen knew that Plaintiff
18  and Sara, not probationer Chou, occupied Plaintiff's bedroom.
19  (PFMF #67.)

20       Plaintiff's bedroom was well-lit by sunlight at the time.
21  (DSUMF #29.)  Plaintiff contends officers entered his bedroom

22

23       [1] Although Officer Sandhagen's police report stated that the
24  door to Plaintiff's room was open and not locked when the
     officers arrived and some officers testified in deposition that
25  they didn't know if Plaintiff's door was open and/or locked when
     they arrived, Defendant does not contest this point in its
26  summary judgment motion, citing Plaintiff's deposition testimony
     to this effect.  Defendant confirmed in its reply brief and at
27  oral argument that it does not contend Plaintiff's bedroom door
     was open when the officers first arrived.
28

without asking for or receiving consent and without a warrant, knowing the room was not occupied by probationer Chou but by others and that the door was locked until the officers knocked. (PFMF ## 66, 67, 71.)  Officer Jasso testified that "[i]f the rooms were locked and we didn't get consent, we wouldn't go into a locked room."  (PFMF #72.)  One of the searching officers, Officer McAbee, characterized the search as "very low risk" and didn't recall the officers entering the Moua home with their weapons drawn because "typically for a low risk search, we're not going to go in with our weapons drawn."  (Ex. H, Holland Declaration, McAbee Depo. at 30.)  In deposition testimony, Officers Nelson, Sandhagen and McAbee all mentioned a safety sweep to secure or clear the area.  Defendant asserts for the first time in its reply brief that a car matching the description of one associated with the homicides being investigated was parked outside the Moua home.  (Doc. 30.)  In support of this assertion, Defendant points to a supplemental report filed by Detective Sterling on February 24, 2005 which mentions such a car but does not indicate when the car was observed or whether the officers at the Moua home saw the car and, if so, when.  (Doc. 30, Larsen Declaration, Exhibit B.)  No Detective Sterling is alleged to have been at the Moua home during the search incident.

At some point an officer pointed out an object that he thought was a weapon hanging on Plaintiff's bedroom wall.  (DSUMF #33.)  Officer Sandhagen testified he went into Plaintiff's bedroom and found the object mounted on the wall immediately to his right as he walked into the bedroom.  (DSUMF ## 34-35.) Officer Sandhagen described the object as a pair of brass

6

knuckles with three eight-inch long knives protruding from them. (DSUMF #37.)  The object was not adhered to the wall or plaque on which it was mounted in any way.  (DSUMF ## 35-36.)  It was made of metal, leather and possibly wood and had four holes through which fingers could be inserted.  (DSUMF #38.)  The knuckle area was about the size of a closed fist, or slightly larger.  (DSUMF #39.)  Officer Sandhagen testified he recognized the object as metal knuckles within the meaning of California Penal Code § 12020(c)(7).  (DSUMF #40.)  He arrested Plaintiff for possession of the object in violation of California Penal Code § 12020(a)(1).  (DSUMF #41.)  Plaintiff later told the officers the object was called a "Pantera Claw."  (DSUMF #42.)  The officers seized the Pantera Claw.  (DSUMF #43.)

When Plaintiff was arrested, he was in the living room on the couch.  (DSUMF #46.)  An officer approached him, told him he was under arrest and requested that he stand up and put his hands behind his back.  (DSUMF ## 46, 49.)  Plaintiff complied and his wrists were handcuffed.  (DSUMF #47.)  The handcuffs did not cause Plaintiff any pain.  (DSUMF #48.)  Plaintiff was led outside to a police car and driven to the fairgrounds, where he was questioned.  (DSUMF ## 50, 54.)  He was then taken to the Sandy Mush Correctional Facility, where he was released on bail after approximately 24 hours.  (DSUMF ## 55-56.)

Plaintiff purchased the Pantera Claw on the Internet, through eBay.  (DSUMF #51.)  He found it in eBay's "collectibles, knives, hobbies" category.  Plaintiff thought the Pantera Claw was "just a decoration" and had no understanding that it could be used as a weapon.  (DSUMF #53.)  Plaintiff was never prosecuted

on the charge for this incident.  (DSUMF #57.)  He has never requested the return of the Pantera Claw and understands it is in the custody of the Merced police department.  (DSUMF ## 44-45.) After the incident, Plaintiff never sought medical care nor did he suffer any emotional distress.  (DSUMF #64.)

Finally, Plaintiff points to the Merced County District Attorney's Refusal of Complaint in support of his claims, noting charges were not filed because "1. Weapon appears not to be covered by PC12020, and 2. Suspect's room should not have been searched-suspect was not on probation/parole did not consent to the search, and there was no exigency justifying the search." (Holland Decl., Ex. A.)  Defendant objects to this evidence on hearsay and relevance grounds.  This objection is overruled as these documents are admissible as business records kept in the ordinary course of business under Fed. R. Evid. 803(b).

### 2.   Disputed Facts.

Defendant contends that Plaintiff did not see any officer searching his bedroom.  (DSUMF #28.)  Plaintiff asserts that he saw officers go into his bedroom and they acknowledged they searched his room at minimum to find the Pantera Claw.  Defendant contends the officers performed a protective sweep of the residence that included entry into Plaintiff's bedroom. Plaintiff acknowledges officers entered his bedroom, but disputes the characterization of the purpose of their entry as a protective sweep.  Plaintiff disputes the timing of when the officer pointed out the Pantera Claw hanging on Plaintiff's bedroom wall and when Officer Sandhagen went into the bedroom and

found it.  Plaintiff asserts it is unclear whether these events occurred during any initial purported "protective sweep" or during a search for evidence.  Plaintiff points to Officer Sandhagen's report after the event, Merced Police Department Report No. 2005-08366 dated February 25, 2005, in which he states "While searching the residence, we noticed that Andrew Moua's bedroom door was open when we arrived [sic] and that it was not locked. Chou had access to Andrew's bedroom so we searched Andrew's bedroom."  (PFMF #65.)  Plaintiff also disputes Officer Sandhagen's description of the object as "brass knuckles," claiming the officer was unsure of the attributes of the object and whether it met the definition of brass knuckles.

Defendant asserts that officers found a rifle and ammunition in the closet of the bedroom of Plaintiff's parents.  Plaintiff does not dispute the fact that a rifle and ammunition were found, but asserts that Mr. Moua directed officers to the rifle in his bedroom.  Plaintiff also claims Chou did not have access to Plaintiff's bedroom and that Chou was being held by officers in the living room when Plaintiff's bedroom door was first opened. (PFMF #68.)

> ### C.   The Officers' Behavior and Treatment of Residents.
> #### 1.   Undisputed Facts.

1) It is undisputed that the officers did not exhibit any intimidation toward Plaintiff or threaten him in anyway.  (DSUMF #62.)

2) Plaintiff did not experience any pain when officers

placed handcuffs on him.   (DSUMF #48.)

3) The officers directed no physical or verbal abuse toward Plaintiff, Sara, or Plaintiff's family.   (DSUMF #61.)

4) The officers never made any profane comments to Plaintiff or belittled him or his family.   (DSUMF #59.) The officers did not say anything that Plaintiff perceived as rude or unprofessional.   (DSUMF #63.)

5) None of the officers made any comments to Plaintiff about his Asian descent or the fact that he had a Caucasian girlfriend. (DSUMF ## 58, 60.)

     D.   <u>Summary of the Complaint</u>.

Plaintiff's complaint contains a laundry list of constitutional deprivations and torts allegedly suffered by Plaintiff at the hands of Defendant City of Merced and its police officers Larry McAbee and unknown officers Does 1-20 and 21-30. The officers are sued in their individual capacities and City of Merced is sued as a municipal entity that "acts by and through its individual officers."   (Doc. 1.)   Count I contains allegations of federal civil rights violations under 42 U.S.C. § 1983.   Plaintiff alleges Defendant's officers violated his Fourth Amendment right to be free from unreasonable search and seizure when they searched his bedroom, in which he possessed a reasonable expectation of privacy, without a warrant and with actual knowledge that the room was separate, locked and/or closed off from the rest of the house.   Plaintiff alleges the officers encountered his locked bedroom door and were informed that Plaintiff resided in the bedroom, that there was a separate

**10**

exterior entrance and that other family members did not have access to the room.  Plaintiff contends Defendant's officers searched his room over his objections and without his consent, a warrant, probable cause or legal or reasonable justification and thus illegally seized the Pantera Claw.  He also alleges Fourth Amendment violations on grounds of excessive force and false and unjustifiable restraint, arrest and imprisonment.

Plaintiff complains of violations of his Fourteenth Amendment right to be free from racial discrimination based on the grounds that officers undertook law enforcement action against him because of his Asian race and ethnicity and the fact that his girlfriend was Caucasian.  On the same grounds, Plaintiff alleges a violation of his First Amendment right to free association.  Plaintiff further alleges retaliation by Defendant and its officers in response to a request for the police report of the incident on Plaintiff's behalf, presumably asserting a First Amendment retaliation claim.

Count II recites state common law claims for trespass, trespass to chattel and conversion, violation of privacy, false arrest, false imprisonment, harassment, and infliction of emotional distress arising out of the incidents described in Count I.  Count III alleges violations of Art. I §§ 2 and 13 of the California Constitution which provide rights to free speech and require probable cause for arrest, respectively.  Also under Count III, Plaintiff asserts a violation of California Civil Code § 52.1, the "Bane Act," which prohibits persons from interfering or attempting to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any individual of rights

11

secured by the Constitution or laws of the United States or by
the Constitution or laws of the State of California.

**E.   Procedural History.**

Plaintiff filed his complaint on February 24, 2006 for
violations of federal civil rights, state common law rights and
state statutory rights.  (Doc. 1.)  Defendant City of Merced
filed its answer on June 27, 2006.  (Doc. 7.)  Defendant Larry
McAbee filed his answer to Plaintiff's complaint on August 15,
2006.  (Doc. 9.)  Defendant City of Merced filed this motion for
summary judgment, or in the alternative, summary adjudication on
July 30, 2007.  (Doc. 18.)  Defendant seeks judgment on the
grounds that Plaintiff cannot 1) establish his federal
constitutional claims, and specifically cannot establish his
Fourth Amendment claims because the Pantera Claw was in plain
view, observed by the officers from inside the Moua home where
they were legitimately present, 2) overcome the qualified
immunity of the individual defendants, or 3) establish Monell
liability of the City of Merced.  Defendant also argues the state
law claims should be dismissed because the officers 4) acted
lawfully, 5) are entitled to immunity under California Government
Code §§ 821.6 and 815.2(b), and 6) Plaintiff lacks evidence to
support some of his claims.

Plaintiff filed his opposition to summary judgment or, in
the alternative, summary adjudication on September 6, 2007.
(Doc. 28.)  Plaintiff opposes summary judgment on grounds that
triable issues of material fact exist as to his Fourth Amendment
claim and common law false imprisonment, trespass, and conversion

claims.   Plaintiff argues Defendant's officers exceeded the legally permissible scope of any search or protective sweep of Plaintiff's room and thus their actions cannot be shielded under the plain view exception to the warrant requirement. Accordingly, Plaintiff contends his arrest, based on illegally discovered evidence, was also illegal and resulted in his false imprisonment under common law.   Plaintiff further contends the illegal entry into his room constitutes the common law tort of trespass and taints the seizure of the Pantera Claw.   Plaintiff argues the unconstitutional seizure of the Pantera Claw, his personal property, makes out the common law tort of conversion. Finally, Plaintiff argues neither the City of Merced nor the individual defendant officers are entitled to qualified immunity or investigative immunity.

In his opposition brief, Plaintiff states he does not oppose summary adjudication of his state constitutional and statutory claims, his common law claims for intentional infliction of emotional distress and harassment, or his claims based on alleged racial or ethnic discrimination.   In this brief Plaintiff does not address his First Amendment claims, his Fourth Amendment claims based on false imprisonment and excessive force, or his common law tort claims for invasion of privacy and trespass to chattels.   At oral argument, Plaintiff confirmed he abandons his Fourteenth Amendment racial discrimination claim, Fourth Amendment excessive force claim, First Amendment retaliation and restriction of free association claims and his state law claims for violation of privacy, infliction of emotional distress, and harassment.   He further confirmed abandonment of his California

13

constitutional claims and Bane Act claims.  As to all these

claims, Defendant's motion for summary judgment is GRANTED.

### III. <u>LEGAL BACKGROUND</u>.

**A.**   <u>Standard of Review</u>.

Summary judgment is warranted only "if the pleadings,

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact."  Fed. R. Civ. Pro. 56©;

*California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).

Therefore, to defeat a motion for summary judgment, the non-

moving party must show (1) that a genuine factual issue exists

and (2) that this factual issue is material.  *Id.*  A genuine

issue of fact exists when the non-moving party produces evidence

on which a reasonable trier of fact could find in its favor

viewing the record as a whole in light of the evidentiary burden

the law places on that party.  *See Triton Energy Corp. v. Square

D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  The evidence

must be viewed in a light most favorable to the nonmoving party.

*Indiana Lumbermens Mut. Ins. Co. v. West Oregon Wood Products,

Inc.*, 268 F.3d 639, 644 (9th Cir. 2001), *amended by* 2001 WL

1490998 (9th Cir. 2001).  Facts are "material" if they "might

affect the outcome of the suit under the governing law."

*Campbell*, 138 F.3d at 782 (quoting *Liberty Lobby, Inc.*, 477 U.S.

at 248).

The moving party bears the initial burden of demonstrating

the absence of a genuine issue of fact.  *Devereaux v. Abbey*, 263

F.3d 1070, 1076 (9th Cir. 2001).  If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000).  However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once the moving party has met its burden of proof, the non-moving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party.  *Triton Energy Corp.*, 68 F.3d at 1221.  The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint.  *Devereaux*, 263 F.3d at 1076.

> [T]he plain language of Rule 56© mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.*, 477 U.S. at 322-23.

"In order to show that a genuine issue of material fact exists, the nonmoving party must introduce some 'significant probative evidence tending to support the complaint.'"  *Rivera v. AMTRAK*, 331 F.3d 1074, 1078 (9th Cir. 2003) (quoting *Liberty Lobby, Inc.*, 477 U.S. at 249).  If the moving party can meet his

burden of production, the non-moving party "must produce evidence in response....[H]e cannot defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements."  *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  "Conclusory allegations unsupported by factual data cannot defeat summary judgment." *Rivera*, 331 F.3d at 1078 (citing *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001)).

     **B.**   <u>**Section 1983**</u>.

     Plaintiff brings this lawsuit under 42 U.S.C. § 1983, which provides a cause of action "against any person acting under color of law who deprives another 'of any rights, privileges, or immunities secured by the Constitution and laws' of the United States."  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003)(quoting 42 U.S.C. § 1983).  "The rights guaranteed by section 1983 are 'liberally and beneficently construed.'"  *Id.* (quoting *Dennis v. Higgins*, 498 U.S. 439, 443 (1991).

     Pursuant to 42 U.S.C. § 1983, Plaintiff may bring a civil action for deprivation of rights under the following circumstances:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a

> judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

To establish liability under 1983, a plaintiff must show 1) that he has been deprived of a right secured by the United States Constitution or a federal law, and 2) that the deprivation was effected "under color of state law." *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003).

C.  *Monell* Liability.

Local governments[2] are "persons" subject to suit for "constitutional tort[s]" under 42 U.S.C. § 1983.[3]  *Haugen v. Brosseau*, 339 F.3d 857, 874 (9th Cir. 2003) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978)).  "[T]he legislative history of the Civil Rights Act of 1871 compels the

---

[2] Although *Monell* dealt with a municipal government's liability under § 1983, the standard there announced was more broadly framed in terms of "a local government." *Brass v. County of L.A.*, 328 F.3d 1192, 1198 (9th Cir. 2003).

[3] "There is certainly no constitutional impediment to municipal liability.  'The Tenth Amendment's reservation of nondelegated powers to the States is not implicated by a federal-court judgment enforcing the express prohibitions of unlawful state conduct enacted by the Fourteenth Amendment.'"  *Monell*, 436 U.S. 691 (quoting *Milliken v. Bradley*, 433 U.S. 267, 291 (1977)).  There is no "basis for concluding that the Eleventh Amendment is a bar to municipal liability."  *Id.* (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976); *Lincoln County v. Luning*, 133 U.S. 529, 530 (1890)).

conclusion that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Id.* at 690.   These bodies "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers...[or for] deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." *Id.* at 690-91.

A local government's liability is limited.   Although a local government can be held liable for its official policies or customs, it will not be held liable for an employee's actions outside of the scope of these policies or customs.

> [T]he language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.   In particular,...a municipality cannot be held liable solely because it employs a tortfeasor, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.

*Monell*, 436 U.S. at 691.   The statute's "language plainly imposes liability on a government that, under color of some official policy,'causes' an employee to violate another's constitutional rights."   *Id.* at 692.

To establish municipal liability, a plaintiff must prove the existence of an unconstitutional municipal policy.   *Haugen*, 351 F.3d at 393.

> [I]t is when execution of a government's policy or

18

custom, whether made by its law-makers or by those
whose edicts or acts may fairly be said to represent
official policy, inflicts the injury that the
government as an entity is responsible under § 1983."

*Monell,* 436 U.S. at 694.   There are various ways a plaintiff may

prove the existence of an unconstitutional municipal policy under

the *Monell* doctrine.   These are discussed in context below.

> ### D.   <u>Suits Against Government Officials: Official Capacity and Individual Capacity Suits</u>.

Suits against an official in her or his official capacity

are treated as suits against the entity on whose behalf that

official acts.   In such suits, the real party in interest becomes

the entity for which the official works.   *Hafer v. Melo*, 502 U.S.

21, 25 (1991).   A federal action for monetary damages against an

individual State official acting in his official capacity is

barred by the Eleventh Amendment in the same way that an action

against the State is barred.   *Doe v. Lawrence Livermore Nat'l

Lab.*, 131 F.3d 836, 839 (9th Cir. 1997).

In contrast, "[p]ersonal-capacity suits seek to impose

personal liability upon a government official for actions [taken]

under color of state law."   *Dittman v. California*, 191 F.3d 1020,

1027 (9th Cir. 1999)(citing *Kentucky v. Graham*, 473 U.S. 159, 165

(1985))(internal quotations omitted).   To establish personal

liability in a § 1983 action, it is enough to show that the

official, "acting under color of state law, caused the

deprivation of a federal right."   *Hafer*, 502 U.S. at 25 (internal

quotations omitted).   Public officials sued in their personal

capacity may assert personal liability defenses, such as

19

qualified immunity.  *Dittman,* 191 F.3d at 1027.  Here Plaintiff sues Officer Larry McAbee and unknown Merced police officers in their individual capacities.

     E.   <u>Qualified Immunity</u>.

     In this case, Defendant City of Merced asserts the defense of qualified immunity on behalf of all the individual defendants. Qualified immunity grows out of the policy concern that few individuals would enter public service if they risked personal liability for their official decisions.  *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).  The immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991), and "spare[s] a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit."  *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). Qualified immunity is not a defense on the merits; it is an "entitlement not to stand trial or face the burdens of litigation" that may be overcome only by a showing that (1) a constitutional right was in fact violated and (2) no reasonable officer could believe defendant's actions were lawful in the context of fact-specific, analogous precedents.  *Saucier v. Katz*, 533 U.S. 194, 200-202 (2001).  Thus deciding qualified immunity entails a two-step analysis.  Detailed legal background on the qualified immunity defense is provided in context below.

IV. <u>DISCUSSION</u>.

     A.   *<u>Monell</u>* <u>Liability of the City of Merced</u>.

     Plaintiff advances the following theories of liability on

20

the part of the City: 1) that the City "countenanced, allowed, condoned, or knowingly ratified the actions and inactions" of the officer defendants by "failing to adequately train, supervise, direct, discipline or control"  their anticipated and preventable conduct in "recurring situations" (Doc. 1 at ¶ 18); 2) that supervising officer Cruz Jasso failed to "countermand Officer Sandhagen's decision [to arrest] though he possessed the authority to do so" and knowledge that the entry into Plaintiff's bedroom was unlawful (Doc. 28 at 4, 16); and 3) that the City has "consciously-chosen indifference to a deprivation of plaintiff's constitutional rights" by promoting Corporal between the incident and filing of the complaint (Doc. 28 at 16).

Local government entities and local government officials acting in their official capacity can be sued for monetary, declaratory, or injunctive relief, but only if the allegedly unconstitutional actions took place pursuant to some "policy statement, ordinance, or decision officially adopted and promulgated by that body's officers...." *Monell*, 436 U.S. at 690-91. Alternatively, if no formal policy exists, plaintiffs may point to "customs and usages" of the local government entity. *Id*. A local government entity cannot be held liable simply because it <u>employs</u> someone who has acted unlawfully. *Id*. at 694. *See also Haugen,* 351 F.3d at 393 ("Municipalities cannot be held liable under a traditional respondeat superior theory. Rather, they may be held liable only when "action pursuant to official municipal policy of some nature caused a constitutional tort.... [T]o establish municipal liability, a plaintiff must prove the existence of an unconstitutional

1  municipal policy.").

2      To prevail in a civil rights claim against a local

3  government under *Monell*, a plaintiff must satisfy a three-part

4  test:

5          (1)  The local government official(s) must have
                intentionally violated the plaintiff's
6                constitutional rights;

7          (2)  The violation must be a part of policy or custom
                and may not be an isolated incident; and
8
           (3)  There must be a link between the specific policy or
9               custom to the plaintiff's injury.

10 *Id.* at 690-92.

11     There are a number of ways to prove a policy or custom of a

12 municipality.  A plaintiff may show (1) "a longstanding practice

13 or custom which constitutes the 'standard operating procedure' of

14 the local government entity;" (2) "the decision-making official

15 was, as a matter of state law, a final policymaking authority

16 whose edicts or acts may fairly be said to represent official

17 policy in the area of decision;" or (3) "the official with final

18 policymaking authority either delegated that authority to, or

19 ratified the decision of, a subordinate." *Menotti v. City of*

20 *Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005).  The Ninth Circuit

21 has held that a municipal policy "may be inferred from widespread

22 practices or evidence of repeated constitutional violations for

23 which the errant municipal officers were not discharged or

24 reprimanded."  Id.

25     Here, there is no <u>direct</u> evidence of the existence of any

26 unconstitutional policy, nor any evidence of a pattern of

27 activity on the part of the City of Merced.  No other incidents

28 are described.  Plaintiff conclusorily alleges "recurring

                                    22

situations" of officer misconduct in his complaint but never provides any facts to show his alleged constitutional violation was part of a policy or custom of the City of Merced. Nevertheless, a municipality may be liable under *Monell* for a single incident where: (1) the person causing the violation has "final policymaking authority;" (2) the "final policymaker" "ratified" a subordinate's actions; or (3) the "final policymaker" acted with deliberate indifference to a subordinate's constitutional violations. *Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999).

The first Christie exception -- where the person causing the violation has "final policy making authority" -- appears not to be applicable here. To prove "ratification" Plaintiff must show by admissible evidence that an "authorized policymaker [has] approve[d] a subordinate's decision and the basis for it" and that the policymaker has knowledge of the alleged constitutional violation. *Id.* at 1239.

> The ratification doctrine, asserted as a basis for municipal liability, originated in *St. Louis v. Praprotnik*, 485 U.S. 112 (1988). There, a plurality of the Supreme Court stated that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id.* at 127. But the sentence from Praprotnik must be read in context. The Court held in Praprotnik that to establish municipal liability, a plaintiff must "prove [ ] the existence of an unconstitutional municipal policy." *Id.* at 128. A single decision by a municipal policymaker "may be sufficient to trigger section 1983 liability under Monell, even though the decision is not intended to govern future situations," *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir.1992)(citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81,(1986)), but the <u>plaintiff must show that the triggering decision was the product of a "conscious, affirmative choice" to ratify the conduct in question.</u> *Gillette*, 979 F.2d at

1347....*See, e.g., Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir.1989) (<u>refusing to hold that the "failure of a police department to discipline in a specific instance is an adequate basis for municipal liability under Monell"</u>).

*Haugen*, 351 F.3d at 393 (emphasis added).  Plaintiff alleges the team of officers at his house on February 24 committed constitutional violations, not anyone with policy making authority.  The only person present at the scene with any "authority" was the supervising officer Cruz Jasso.  Plaintiff does not contend or offer evidence that Officer Jasso was involved in any policymaking for the Merced Police Department.

The third exception -- the final policymaker acted with "deliberate indifference" to a subordinate's constitutional violations --  is a "stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Board of County Com'rs of Bryan County, Okl. v. Brown,* 520 U.S. 397, 410 (1997).  A municipality's failure to train, supervise, or discipline an employee can be the basis for § 1983 liability if there is proof of deliberate indifference.

A policy can be one of action or inaction. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Under Canton, a plaintiff can allege that through its omissions the municipality is responsible for a constitutional violation committed by one of its employees, even though the municipality's policies were facially constitutional, the municipality did not direct the employee to take the unconstitutional action, and the municipality did not have the state of mind required to prove the underlying violation. Id. at 387-89. To impose liability against a county for its failure to act, a plaintiff must show: (1) that a county employee violated the plaintiff's constitutional rights; (2) that the county has customs or policies that amount to deliberate indifference; and (3) that these customs or policies were the moving force behind the employee's violation of constitutional rights.

*Gibson v. County of Washoe*, 290 F.3d 1175, 1193-94 (9th Cir.2002).

*Long v. County of Los Angeles*, 442 F.3d 1178, 1185-86 (9th Cir. 2006)(citations edited).

For example, a failure to train can satisfy the "deliberate indifference" standard under certain circumstances:

> The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy. *Id*. at 390.
>
> In *Board of County Commissioners v. Brown*, 520 U.S. 397 (1997), the Supreme Court discussed the circumstances under which inadequate training can be the basis for municipal liability. The first is a deficient training program, "intended to apply over time to multiple employees." *Id*. at 407. The continued adherence by policymakers "to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action-the 'deliberate indifference'-necessary to trigger municipal liability." *Id*. Further, "the existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Id*. at 407-08.
>
> A plaintiff also might succeed in proving a failure-to-train claim without showing a pattern of constitutional violations where "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Id*. at 409.

*Id*. at 1186 (citations edited).

Nevertheless, a court should hesitate to impose liability based on a single decision.  In applying the "deliberate indifference" exception, the *Christie* court relied on *Board of County Com'rs of Bryan County, Okl.,* 520 U.S. at 408-409:

> Where a claim of municipal liability rests on a single decision, not itself representing a violation of federal law and not directing such a violation, the danger that a municipality will be held liable without fault is high. Because the decision necessarily governs a single case, there can be no notice to the municipal decisionmaker, based on previous violations of federally protected rights, that his approach is inadequate. Nor will it be readily apparent that the municipality's action caused the injury in question, because the plaintiff can point to no other incident tending to make it more likely that the plaintiff's own injury flows from the municipality's action, rather than from some other intervening cause."

Here Plaintiff provides no evidence regarding officer training or its adequacy.  Plaintiff does not assert how the City of Merced was deliberately indifferent to his constitutional rights.  Nor does Plaintiff provide evidence that any deliberate indifference on the City's part or alleged failure to train any officer "was the moving force" behind the violation of his constitutional rights.  There is no training evidence.

Finally, Plaintiff asserts that Officer Jasso was promoted at some time after the incident, contending his promotion was a ratification by the City of his alleged unconstitutional conduct. To prove ratification under *Christie*, Plaintiff must offer evidence that an "authorized policymaker [has] approve[d] a subordinate's decision and the basis for it" and that the policymaker had knowledge of the alleged violation.  *Christie*, 176 Cal.3d at 1239.  Here Plaintiff has not submitted any evidence that any command level policymaker promoted Officer Jasso or that any supervisor had knowledge of the alleged conduct, let alone that such a person made a "conscious affirmative choice to ratify the conduct in question."  *Haugen*,

26

351 F.3d at 393.

The evidence of only one example, this case, does not show that the City of Merced either operates under a policy or custom that allows officers to make unlawful entries and seizures, or to act with deliberate indifference toward the rights of persons to be free from such conduct.  There are no material issues of fact concerning the City's *Monell* liability.

Summary judgment is GRANTED in favor of the City of Merced as to Plaintiff's *Monell* claim.


B.   <u>Qualified Immunity of Individual Merced Police Officers on Fourth Amendment Claim</u>.

Defendant City of Merced moves for summary judgment on behalf of the individual defendants on the grounds that they are entitled to qualified immunity.  The standard for qualified immunity implicates the legal bases for the alleged constitutional violations.  Deciding qualified immunity entails a two-step analysis.  First, a court must ask whether a constitutional violation occurred at all.  If the answer to this question is yes, the court must then inquire whether the right violated was "clearly established" by asking whether a reasonable officer could believe that the defendant's actions were lawful. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The traditional summary judgment approach should be used in analyzing the first step of the *Saucier* analysis:

A court required to rule upon the qualified immunity issue must consider, then, this threshold question:

27

> Taken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional right? Where the facts are disputed, their resolution and determinations of credibility are manifestly the province of a jury.

*Wall v. County of Orange*, 364 F.3d 1107, 1110-1111 (9th Cir. 2004) (internal citations and quotations omitted)*.*  In the second step, the court must ask whether it would be clear to a reasonable official that his conduct was unlawful in the situation confronted.  Although this inquiry is primarily a legal one, where the reasonableness of the officer's belief that his conduct was lawful "depends on the resolution of disputed issues of fact...summary judgment is not appropriate." *Wilkins v. City of Oakland*, 364 F.3d 949, 1110-11 (9th. Cir. 2003) (citing *Saucier*, 533 U.S. at 216 (Ginsburg J., concurring)).

Under *Saucier*, the first question is whether "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right."  Here Plaintiff alleges the officers violated his Fourth Amendment right to be free from unreasonable search and seizure by entering his bedroom and seizing his Pantera Claw.  Defendant contends the entry was lawful under the plain view doctrine and thus the seizure was also lawful.

Under the Fourth Amendment the right of the people to be secure in their persons, houses, and effects, against unreasonable searches and seizures, shall not be violated.  U.S. Const. amend. IV.; *Menotti v. City of Seattle,* 409 F. 3d 1113, 1152 (9th Cir. 2005).  The Supreme Court has held that "in the ordinary case, seizures of personal property are unreasonable

28

within the meaning of the Fourth Amendment, without more, unless accomplished pursuant to a judicial warrant issued by a neutral and detached magistrate after finding probable cause." *Id.* However, when faced with special law enforcement needs, the Supreme Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable. *Id.*

Merging the Fourth Amendment standard with the qualified immunity presumption results in a two-step inquiry in which Plaintiff must establish that 1) the officers' search of his bedroom exceeded the scope of a valid probation search or protective sweep and the plain view exception is inapplicable, and 2) that it would have been clear to a reasonable officer, confronting the same circumstances, that the actions of the officers were illegal. *See Saucier*, 533 U.S. at 202.

### 1. Constitutional Violation

Plaintiff does not dispute that the officers had lawful authority for a probation search of Chou's residence, given the conditions of his brother's probation. Plaintiff contends that the officers exceeded the scope of their authority in entering his bedroom, which was not a proper subject of their search. Plaintiff also asserts that any entry by the officers based on a protective sweep theory is improper under the Fourth Amendment as there was no reasonable justification for such a sweep at the time.

29

Defendants contend that while it is unclear whether officers observed the Pantera Claw from outside of Plaintiff's bedroom or after entry, it is immaterial because defendant officers were legally justified to be in Plaintiff's room regardless, either as part of a lawful probation search or protective sweep, incident to that search.  Accordingly they claim they observed the Pantera Claw from a lawful place in plain view.

It is well established that a person does not have a reasonable expectation of privacy with respect to items that are in plain view from a place where officers have a legitimate right to be.  *U.S. v. Garcia*, 997 F.3d 1273, 1280 (9th Cir. 1993).  Under the plain view doctrine, officers may lawfully seize an item if the following three conditions are met: 1) the item is in plain view; 2) the officers are lawfully searching in a place for one thing; and 3) the incriminating nature of the item is immediately apparent.  *Horton v. California*, 496 U.S. 128, 135-36 (1990).

Here there is no dispute that the Pantera Claw was in plain view on the wall of Plaintiff's bedroom.  Officer Sandhagen testified that he recognized the object as brass knuckles within the meaning of California Penal Code 12020(c)(7), describing the object as containing projections of eight-inch long blades, made partially of metal, and the approximate size of a fist with holes through which fingers could fit.  The incriminating nature of an object is "immediately apparent" if the officer has probable cause to associate it with criminal activity.  *U.S. v. Hudson*, 100 F.3d 1409, 1420 (9th Cir. 1996).  Metal knuckles are defined

**as:**

> **any device or instrument made wholly or partially of metal which is worn for purposes of offense or defense in or on the hand and which either protects the wearer's hand while striking a blow or increases the force of impact from the blow or injury to the individual receiving the blow. The metal contained in the device may help support the hand or fist, provide a shield to protect it, or consist of projections or studs which would contact the individual receiving a blow.**

**Cal. Penal Code § 12020(c)(7).**

**Officer Sandhagen's testimony clearly establishes he had probable cause to associate the Pantera Claw with criminal activity, meeting the "immediately apparent" prong of the plain view doctrine. The first and third requirements of the plain view doctrine are satisfied. If the officer made the observation of the Pantera Claw from outside of Plaintiff's bedroom, either in the hallway or at the threshold of Plaintiff's bedroom door, then the analysis would stop here and the search and seizure would be reasonable under the Fourth Amendment's plain view doctrine. However, Defendants concede that there is a dispute in the evidence about the officer's location when he first made the observation and there is no evidence that this observation was made from outside Plaintiff's bedroom. There is a further dispute whether the bedroom door was initially locked and the door not accessible or in view through a closed, locked door. Factual inferences must be drawn against the moving party.**

### a.   Valid Scope of Probation Search.

**A critical issue is whether the officers were legitimately**

in the location from which they observed the Pantera Claw. Officer Sandhagen testifies that one of the officers pointed the Pantera Claw out to him and he saw it on the wall as he "walked into the bedroom immediately to [the] right."  From this testimony it is unclear from what location the Pantera Claw was first observed.  Defendants argue that if the observation took place inside Plaintiff's room, it was lawful because incident to the probation search they had the right to search areas that Chou had access to or over which he had at least joint authority.

In evaluating the unlawful search and seizure claims of two defendants who lived with a probationer subject to a probation search condition under federal constitutional standards, the California Supreme Court in *People v. Woods* held "[T]he search in [a probation] case remains limited in scope to the terms articulated in the search clause [citations] and to those areas of the residence over which the probationer is believed to exercise complete or joint authority." 21 Cal.4th 668, 981 (1999) (citing U.S. v. Matlock, 415 U.S.164, 170-171 (1974)).  "Moreover officers generally may only search those portions of the residence they reasonably believe the probationer has complete or joint control over. [Citations.] That is, unless the circumstances are such as to otherwise justify a warrantless search of a room or area under the sole control of a nonprobationer (e.g., exigent circumstances), officers wishing to search such a room or area must obtain a search warrant to do so."  *Id*.

Plaintiff claims he and his girlfriend Sara had sole

authority over his bedroom and probationer exercised no such authority over that bedroom.  He points to the fact that the door was locked when police arrived, was routinely closed and locked for privacy, and the fact that it has a separate exterior entrance.  Plaintiff claims the officers knew he and Sara occupied the room, not Chou.  Defendant counters that while the bedroom door was closed when officers arrived, officers were not aware it was locked or that Chou had no access to the room, or that Plaintiff's bedroom had a separate exterior entrance.  They further point out that Plaintiff and Sara left the door open when they exited the bedroom.

Disputed issues of material fact exist as to what the officers knew in regard to whether Chou had joint authority over Plaintiff's room or whether Plaintiff and Sara had sole and complete authority over the bedroom.  No one told the officers that Chou did not have access to the room or that it had a separate entrance.  Plaintiff claims officers had to know the door was locked because they must have heard Sara unlock it in response the officer's knock.  But no officer testified that he thought the door was locked or heard it being unlocked.  Because these material facts are in dispute, summary judgment cannot be granted on the valid probation search theory.

b.   <u>Valid Protective Sweep</u>.

Defendants argue that even if officers did not have lawful authority to enter Plaintiff's room as part of the probation search, they validly entered the room as part of a protective

sweep of the residence prior to the start of the search.

> A protective sweep is a quick and limited search of
> premises, incident to an arrest and conducted to
> protect the safety of police officers or others.
> Maryland v. Buie, 494 U.S. 325, 327 (1990).
>
> We hold that there must be articulable facts which,
> taken together with the rational inferences from those
> facts, would warrant a reasonably prudent officer in
> believing that the area to be swept harbors an
> individual posing a danger to those of the arrest
> scene. Id. at 334.

_____Defendant argues officers had knowledge of undisputed

articulable facts that would warrant a reasonably prudent

officer's belief that the area posed a danger.  Defendant cites

the fact that officers were at the Moua home as part of an

investigation into a double homicide they suspected was gang-

related.  The officers suspected Chou was a gang member, but do

not assert he was validated.  The Officers knew he had been

convicted of the felony of carrying a concealed loaded weapon.

Defendants also provide Detective Sterling's supplemental report

that a vehicle matching the description of the one involved in

the double homicide, a silver Acura Integra, was parked outside

the Moua residence.

Plaintiff does not dispute any of these facts but argues the

officers did not have reasonable suspicion in this case to

perform a protective sweep, because other evidence shows officers

did not believe there was a danger to their safety at the time of

the incident.  Plaintiff claims that Officer Sandhagen's police

report about the reason officers entered plaintiff's bedroom is

inconsistent with other testimony he provides and the testimony

of other officers.  In the police report Sandhagen prepared the

day after the incident, Officer Sandhagen stated the reason they entered the room was: "Chou had access to Andrew's bedroom, so we searched Andrew [Plaintiff's] bedroom."  The police report does not mention any concern about safety or any need for a protective sweep.  However, in deposition testimony Officer Sandhagen cited safety as a concern, as did Officers Nelson and McAbee.  Officer McAbee in his deposition characterized the search as very low risk and did not recall any of the officers drawing their weapons upon entry.

Disputed issues of material fact exist as to whether officers went into Andrew's room to search for evidence or as part of a safety or protective sweep and whether articulable facts existed to support the officers' reasonable suspicion that there was a need for a protective sweep.  On the day of the incident, the arresting officer reports officers went into Plaintiff's room to search because  "Chou had access."  Later the same officer testifies they didn't consult Plaintiff about entry into his room because of safety purposes.  (Sandhagen Depo. at 54-55.)  These differences implicate credibility.  Such conflicting evidence must be resolved by a trier of fact.  Other officers claim they "secured" or "cleared" the area for safety reasons but Officer McAbee, testified that he could not recall any officer drawing a weapon,, and characterized the search as "very low risk."  It is undisputed that Chou was in the front room when officers entered the residence.  They did not need to search the house to find him.  It is undisputed that no officer said anything to the Plaintiff or Sara when they exited their bedroom.  This supports

the inference that no officer asked whether anyone else was in their room.  No officer verbally expressed safety concerns at the residence to justify entering the bedroom.  At oral argument, defendants' counsel argued the search was "a slow very deliberate standard probation search" that involved no rushing, and "was not a high profile tactical entry."  On the other hand, Defendant notes that an officer who wasn't on the scene, stated in a supplemental police report that a car matching the description of one used in the recent homicides was parked outside the Moua home.  However, Defendant does not claim that the searching officers at the Moua residence, observed or knew about this car at the time of their entry, nor does anyone explain when the car was observed.

The evidence is in conflict as to the reason for entering Plaintiff's room and as to the existence of articulable facts to support reasonable justification for a protective sweep.  Summary judgment cannot be granted on these grounds.


   2.   <u>Was the law clearly established?</u>

Here the facts are in dispute as to whether the officers acted reasonably in including Plaintiff's room within the scope of the probation search because the facts about what the officers knew about the probationer's access to or authority with respect to Plaintiff's bedroom are unclear.  Facts underlying whether the officers had reasonable suspicion that potential danger existed to justify a protective sweep are also in dispute.  The reasonableness of the officers' beliefs that their actions were

lawful in this situation depends on how the facts are ultimately determined by a trier of fact.  They cannot be decided as a matter of law.


### 3.   Conclusion

For all the reasons stated above, summary judgment is DENIED as to Defendant's claim that the officers committed no Fourth Amendment violations because their actions were lawful incident to the probation search and/or the protective sweep.


### C.   Remaining state law claims: False Imprisonment, False Arrest, Trespass and Trespass to Chattel/Conversion.

Because Plaintiff's Fourth Amendment claims of unlawful search and seizure survive due to the existence of disputed issues of material fact, his remaining state claims also survive as they flow from the alleged Fourth Amendment violation. Summary judgment is DENIED as to Plaintiff's state law claims for false imprisonment, false arrest, trespass and trespass to chattels/conversion.


### V. CONCLUSION

Defendant City of Merced's motion for summary judgment is GRANTED as to Plaintiff's 1) Fourteenth Amendment racial discrimination claim, Fourth Amendment excessive force claim, and First Amendment retaliation and restriction of free association claims; 2) state common law claims for violation of privacy,

37

infliction of emotional distress, and harassment and California constitutional and Bane Act claims; and 3) *Monell* claim.

Summary judgment is DENIED as to Plaintiff's claim of unlawful search and seizure in violation of the Fourth Amendment.

Summary judgment is DENIED as to Plaintiff's state law claims for false imprisonment, false arrest, trespass and trespass to chattels/conversion.

Defendants' counsel shall prepare and lodge an order with this Court within five days following the date of service of this decision.


IT IS SO ORDERED.

Dated:   November 14, 2007            /s/ Oliver W. Wanger
                                    UNITED STATES DISTRICT JUDGE